2010 Ark. App. 304

**R.C. LANDSCAPING and FirstComp Ins. Co., Appellants**

v.

**William B. JONES, Death & Permanent Total Disability Trust Fund, and Second Injury Fund, Appellees.**

No. CA 09–664.

Court of Appeals of Arkansas.

April 7, 2010.

Rehearing Denied May 19, 2010.

762

Cynthia Estes Rogers, Frye Law Firm, P.A., North Little Rock, AR, for appellant.

David Barton Simmons, Little Rock, Marc Ira Baretz, West Memphis, AR, for appellee.

WAYMOND M. BROWN, Judge.

Appellee William B. Jones sustained a compensable back injury on June 6, 2005, while working for appellant R.C. Landscaping (RCL).[1] Jones's injury occurred when a tractor rolled over him, breaking his back in multiple places. He sought additional benefits and a hearing was held before the Administrative Law Judge on April 23, 2008. The parties stipulated that Jones's healing period ended on October 25, 2005.[2] They also stipulated that Jones suffered an eleven-percent impairment to the body as a whole. The issues litigated at the hearing were the amount of Jones's permanent physical impairment; wage loss/permanent total disability; second-injury fund liability; and controverted attorney's fees. The ALJ issued an opinion on July 10, 2008, finding that Jones had suffered a seventeen-percent permanent physical impairment to the body as a whole; that Jones was permanently totally disabled; that the Second Injury Fund was liable for the payment of permanent total disability benefits; and that Jones was entitled to attorney's fees. The Second Injury Fund appealed the ALJ's decision to the Arkansas Workers' Compensation Commission.[3] The Commission reversed the ALJ's decision. In its April 7, 2009 opinion, the Commission found that Jones failed to prove that he was permanently and totally disabled but that he proved wage-loss disability in the amount of forty percent. The Commission also found that the Second Injury Fund had no liability.

Appellants RCL and its insurer, FirstComp Ins. Co., appeal the Commission's decision, raising three points for reversal: 1) that the Commission's opinion offers no true majority opinion from which this Court may conduct a meaningful review; 2) that the Commission erred in finding that Jones was entitled to forty-percent wage-loss disability; and 3) that the Commission erred in finding that the Second Injury Fund had no liability for wage-loss disability. Jones cross-appeals, contending that the Commission erred in finding 1) that he was not permanently and totally disabled and 2) that he was only entitled to wage-loss disability in the amount of forty percent. We affirm the direct appeal and cross-appeal.

In reviewing decisions from the Workers' Compensation Commission, we

---

1. The compensability of appellee's injury was adjudicated in a March 26, 2006 hearing before the Arkansas Workers' Compensation Commission.

2. Dr. Jeffrey Kornblum's note for that date indicated that Jones should avoid any lifting over thirty pounds through the end of the year and that he should also avoid any shoveling through the end of the year.

3. There was no appeal of Jones's seventeen-percent impairment rating.

view the evidence and all reasonable inferences deducible therefrom in the light most favorable to the Commission's findings, and we affirm if the decision is supported by substantial evidence.[4] Substantial evidence exists if reasonable minds could reach the Commission's conclusion.[5] It is the Commission's function to determine witness credibility and the weight to be afforded any testimony.[6] The Commission must weigh the medical evidence and, if such evidence is conflicting, its resolution is a question of fact for the Commission.[7] The Commission's resolution of the medical evidence has the force and effect of a jury verdict.[8] Jones testified that he was sixty-one years old; that he had a seventh-grade education; that he had "done mostly foundry work"; and that his back was preventing him from going back to work. He acknowledged that he had drawn Social Security before going to work for RCL due to a head injury received in a car accident. According to Jones, RCL was aware that he was drawing disability. Jones stated that since the June 6, 2005 injury, he has difficulty standing longer than fifteen minutes, lifting anything, and kneeling. Jones said that he had not worked since the injury and that he did not know of any type of work he could do. On cross-examination, Jones stated that he injured his head between 1959 and 1960. He said that due to his head injury, his "memory is vague." However, he testified that prior to the 2005 compensable injury he was able to fill out applications and read and write "pretty good." Jones stated that in November 2004 John Miles was overseeing his money

from Social Security. According to Jones, his head injury prevented Social Security from sending the funds directly to him. He stated that he currently lives alone but that his nephew and his nephew's wife come daily to check on him and make sure he has what he needs. Jones testified that he burns things when he cooks because he forgets about them. He told the ALJ that his back is worse compared to October 2005. Jones further testified that his doctor told him that he could not go back to work; that Randy Carroll told him that he could not return to work; and that he would have returned to work had Carroll allowed him. According to Jones, he injured his head when he was about fourteen or fifteen years old and he was able to do "all kinds of work since then[.]" He stated that he did not have any trouble working until his compensable injury. Jones said that his memory problems started after his compensable injury; however, he testified that his "back is the main problem [he has] in getting around and working."

Randy Carroll testified that he owned RCL and that he was aware that Jones was getting Social Security when he hired him. He stated that Jones wanted to come back to work but that Jones could not produce a doctor's note releasing him back to work. According to Carroll, he was never aware that Jones was released by his doctor to return to work without any restrictions. Carroll stated that Jones never came to him after October 2005. Carroll testified that had Jones presented him with a doctor's release, Jones would

4. *Foster v. Express Pers. Servs.*, 93 Ark. App. 496, 222 S.W.3d 218 (2006).

5. *Jivan v. Economy Inn & Suites*, 370 Ark. 414, 260 S.W.3d 281 (2007).

6. *Searcy Indus. Laundry, Inc. v. Ferren*, 82 Ark. App. 69, 110 S.W.3d 306 (2003).

7. *Id.*

8. *Jim Walter Homes v. Beard*, 82 Ark. App. 607, 120 S.W.3d 160 (2003).

have had a job at the same rate of pay he had in the past.

On cross-examination, Carroll stated that he had known Jones since the 1970s when Jones worked for Carroll's father. He stated that Jones worked for him in some capacity for three and a half to four years. On re-cross, Carroll stated that Jones was "always physically able to perform the job duties."

Heather Taylor testified that she was a vocational counselor at Systemedic Corporation. She stated that she was asked to perform a rehabilitation evaluation on Jones. According to Taylor, she reviewed reports from Dr. Kornblum and the deposition testimonies of Jones and Carroll. Taylor opined that Jones was physically capable of working but that his mental defects caused her some concerns:

> I read a report from Dr. Kornblum that indicated that by the end of 2005, he did not anticipate any permanent work restrictions. I've not seen anything to indicate any restrictions from a doctor that indicate that he is unable to work. The only statement I see about being disabled from Dr. Simard is that it says "the patient is disabled secondary to that injury." I don't see anything related to functional abilities. This would have been in October of 2007. As we sit here today, I am not aware of any actual functional restrictions that were placed on Mr. Jones as far as his back injury is concerned.... As far as his back injury, since Dr. Kornblum released him with no restrictions, he would be able to do these jobs from a physical standpoint. I did have some concerns from a mental standpoint in that he had very significant mental deficits.... Poor memory and significant cognitive components would be the greatest barrier in returning to work.... None of the things ... would be related to his back injury.

Taylor stated that she referred Jones to Dr. A.J. Zolten for neuropsychological testing and that based on the report she received from him, she did not make any vocational recommendations for Jones. Taylor also stated that Dr. Zolten ordered a CT scan for Jones. Taylor opined that Jones would not be successful in returning to the work force. She stated that from a physical standpoint, Jones could possibly do unskilled labor, but that he possessed mental deficiencies that were potential barriers.

On cross-examination, Taylor stated that she had reservations about Jones returning to work due to his "significant mental problems." She testified that she did not know if Jones's mental problems were worse since his compensable injury. She stated that she believed Jones "had a very good employer that was willing to work around his deficits." When asked about Dr. Simard's October 5, 2007 report, Taylor stated that if she were going to rely on an opinion that Jones was disabled secondary to his compensable injury, she would have to "ask the doctor if there were any functional abilities that [Jones] could perform or whether or not [the doctor] was indicating that [Jones] was totally disabled from work." She further stated that she would like to have clarified Dr. Simard's report with him, but that she was never furnished that report.

On redirect, Taylor stated that she could have ordered a functional capacity evaluation in this case but she did not because Dr. Kornblum stated in his report that he did not anticipate permanent restrictions.

Jones's deposition testimony was admitted as evidence. In the deposition, Jones testified that he never had any neck and back injuries prior to his compensable injury in 2005. According to Jones, he began receiving disability after he fell off of a porch and broke his jaw about twenty

years ago. He stated that he did not know if the fall caused brain injury or how it affected his mind. Jones said that his head "is all right right now, but [he] get[s] a little confused."

RCL's first point on appeal is that there was no true majority opinion from which to conduct a meaningful review. RCL cites *Wright v. American Transportation* [9] for its proposition that the "Commission is obliged to make findings and conclusions with sufficient detail and particularity to allow the Court to decide whether its decision is in accordance with the law." RCL contends that the Commission's opinion failed to do so, and must be reversed.

Commissioner Bell authored an opinion, which reversed the ALJ's decision. In that opinion, Commissioner Bell stated that Jones was not permanently and totally disabled. Commissioner McKinney concurred with Commissioner Bell that Jones was not permanently and totally disabled. Commissioner Bell's opinion granted Jones forty-percent wage-loss disability and Commissioner Hood concurred with this decision. Commissioner Bell's opinion also stated that there was no SIF liability and Commissioner McKinney concurred. Two out of three commissioners agreed that Jones should receive forty-percent in wage-loss disability, that Jones was not permanently and totally disabled, and that the SIF had no liability. Therefore, RCL's claim that there was not a majority opinion in which to conduct a meaningful review is without merit.

Next, RCL argues that substantial evidence does not support the Commission's award of forty-percent wage-loss disability to Jones. Jones argues on cross-appeal that the Commission erred in awarding him only forty-percent wage-loss disability and by denying him permanent total disability.

The wage-loss factor is the extent to which a compensable injury has affected the claimant's ability to earn a livelihood.[10] When a claimant has an impairment rating to the body as a whole, the Commission has the authority to increase the disability rating based upon wage-loss factors.[11] The Commission is charged with the duty of determining disability based upon a consideration of medical evidence and other factors affecting wage loss, such as the claimant's age, education, and work experience.[12] Motivation, post-injury income, credibility, demeanor, and a multitude of other factors are matters to be considered in claims for wage-loss disability benefits in excess of permanent physical impairment.[13] A claimant's lack of interest in pursuing employment with his employer and negative attitude in looking for work are impediments to the full assessment of wage loss.[14]

Commissioner Bell's opinion denied Jones permanent total disability but it granted him wage-loss disability in the amount of forty percent:

> The claimant is age 62 and has very little formal education. The claimant testified that his reading and writing ability are very limited. The claimant's

9. 18 Ark. App. 18, 709 S.W.2d 107 (1986).

10. *Wal–Mart Stores, Inc. v. Connell*, 340 Ark. 475, 10 S.W.3d 882 (2000).

11. *Lee v. Alcoa Extrusion, Inc.*, 89 Ark. App. 228, 201 S.W.3d 449 (2005).

12. *Id.*

13. *Henson v. Gen. Elec.*, 99 Ark. App. 129, 257 S.W.3d 908 (2007).

14. *Logan County v. McDonald*, 90 Ark. App. 409, 206 S.W.3d 258 (2005).

work history includes primarily unskilled labor....

In January 2008, the vocational consultant noted the claimant's work history of unskilled manual labor in addition to the claimant's limited academic abilities. The vocational consultant opined that the claimant "has no transferable skills, as he has only performed unskilled labor his entire working life.... it is my opinion that his chances of returning to the workforce with another employer are very poor. Therefore, I am not recommending a vocational rehabilitation plan for Mr. Jones." Nevertheless, the consultant also opined that the claimant "does not appear to have any permanent physical limitations as a result of his 6/05 injury.... Mr. Jones told me he is 'done with' working and does not think he can do much anymore."

The claimant informed the vocational consultant that he did not intend to try and return to work. The Full Commission notes the claimant's testimony in 2006 that he did not intend to return to work. The record in the present matter demonstrates that the claimant is not motivated to seek suitable employment within his physical abilities. Dr. Kornblum did not assign any permanent physical restrictions. The claimant's lack of interest in returning to work and his negative attitude are an impediment to a full assessment of the claimant's wage-loss disability, and his demonstrated lack of motivation can be considered by the Commission. *City of Fayetteville v. Guess*, 10 Ark. App. 313, 663 S.W.2d 946 (1984). The vocational consultant opined that the instant claimant had the physical ability to return to work, albeit apparently not with the respondent-employer. The claimant has proved that

he sustained 40% wage-loss disability in addition to 17% anatomical impairment. The claimant did not prove by a preponderance of the evidence that he was permanently and totally disabled as a result of his compensable injury.

Commissioner Hood wrote an opinion concurring with the grant of forty-percent wage-loss disability. Substantial evidence supports the Commission's award of forty-percent wage-loss disability benefits. Accordingly, we affirm the Commission on this point. Substantial evidence also supports the Commission's conclusion that Jones was not permanently and totally disabled. Therefore, we affirm the Commission on this point also.

 Finally, RCL argues that the Commission erred in finding that the Second Injury Fund had no liability. For the Second Injury Fund to be liable under workers' compensation law, three hurdles must be met: 1) the employee must have suffered a compensable injury at his current place of employment; 2) prior to that injury, the employee must have had a permanent partial disability or impairment; and 3) the disability or impairment must have combined with the recent compensable injury to produce the current disability status.[15] The Second Injury Fund is obligated to provide compensation for any disability greater than the disability resulting from the earlier injury and the anatomical impairment caused by the second injury.[16] According to Commissioner Bell's decision, Jones's injury did not give rise to Second Injury Fund liability:

There is no probative evidence before the Commission demonstrating that prior to the compensable injury the claimant had a permanent partial disability or impairment. The Full Commission rec-

**15.** *Rice v. Georgia Pacific Corp.,* 72 Ark. App. 148, 35 S.W.3d 328 (2000).

**16.** *Id.*

ognizes Dr. Kornblum's June 24, 2005 notation, "PSH: Unknown cranial procedure—MVA." Dr. Kornblum's notation of an unknown cranial procedural is not probative evidence demonstrating that there was a prior permanent partial disability or impairment. During the May 26, 2006 hearing before the Commission, there was no indication in the claimant's lengthy detailed testimony that he was suffering from a "mental deficit" resulting from a prior permanent partial disability or impairment. The claimant testified that he began receiving Social Security disability in the 1980's after falling from a porch and breaking his jaw. There is no evidence before us demonstrating that the claimant had a permanent partial disability or impairment involving his jaw. Nor is there any evidence demonstrating a "mental deficit" as a result of the claimant's fall from a porch.

. . .

Dr. Zolten opined that the claimant had limited cognitive abilities but noted, "He has a remote history of a possible closed head injury, but I do not think that this is contributory to his current functioning right now." A CT of the claimant's brain was taken on April 17, 2008. This diagnostic test showed ischemic change in the white matter, a "possible remote" cerebrovascular accident, and "no evidence for an acute intracranial event or hemorrhage." Neither Dr. Zolten's report nor the CT of the brain are probative evidence demonstrating that the claimant had a prior disability or impairment involving his brain. Nor does the record show that the claimant had "mental deficits" resulting from a motor vehicle accident.

Even if there was a permanent partial disability or impairment prior to the compensable injury, which the evidence before the Commission does not demonstrate, there was no proof that a disability or impairment combined with the recent compensable injury to produce the claimant's current disability status. The claimant expressly testified that he considered himself unable to work "on account of my back." We note the claimant's testimony of record at the April 5, 2006 deposition that a possible remote head injury "doesn't affect me" with regard to the claimant's ability to return to work. Neither the claimant's testimony nor the documentary evidence before us demonstrates that there was a "combination" producing the claimant's current disability status.

Commissioner McKinney wrote an opinion concurring with Commissioner Bell's conclusion that there was no SIF liability. According to Commissioner McKinney, "the evidence is crystal clear that the claimant's disability status is due to his prior head injury and not due to his work-related injury with the respondent employer."

The commissioners explained why the Second Injury Fund was not liable, and substantial evidence supports this decision. Therefore, we affirm.

Affirmed on direct appeal; affirmed on cross-appeal.

VAUGHT, C.J., agrees.

PITTMAN, J., concurs.